## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

ROBERT EDWARDS,

    Petitioner,

v.                                              Case No: 8:13-cv-2586-T-30TBM
                                                    Crim. Case No: 8:11-cr-476-T-30TBM

UNITED STATES OF AMERICA,

    Respondent.

## **ORDER**

THIS CAUSE came before the Court for an evidentiary hearing on July 22, 2014, upon Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Dkt. #1), the Government's Response thereto (Dkt. #11), and Petitioner's Reply (Dkt. #17). Upon consideration, the Court concludes that the petition should be denied.

### **Background**

### **Facts Admitted at Sentencing**

At his sentencing, Edwards admitted to the following facts contained in his presence report:

> 8. The conduct of Edwards and Marc Gregory Allen ("Marc Allen") was discovered when the law firm of Greenberg Traurig, PA., reported that their client, Bloomfield Institutional Opportunity Fund, LLC ("Bloomfield"), had been defrauded by Allen Investment Properties, LLC, its owner—Marc Allen, and others.
>
> 9. Harbourtowne at Countrywoods ("Harbourtowne") is a condominium development in Dunedin, Florida, owned by William Allen ("William Allen"). William Allen hired his son, Marc Allen, to manage the property.

William Allen granted his son limited power of attorney to enable him to lease units and manage the property. Marc Allen had no legal right to encumber the property or otherwise pledge the property as collateral.

10. Edwards and Marc Allen created and filed at the Pinellas County Courthouse (Florida) a fraudulent power of attorney document with the forged signature of William Allen purporting to empower Marc Allen to encumber Harbourtowne. On June 28, 2007, Edwards and Marc Allen obtained an initial $1,078,000 mortgage from lender, Lawrence Shapiro Lending, LLC, encumbering Harbourtowne based on the fraudulent claim that he had the legal right to engage in the transaction. On August 31, 2007, December 20, 2007, and March 24, 2008, Edwards and Marc Allen obtained three additional loans on the property from Lawrence Shapiro Lending, LLC, totaling $776,381.63.

11. On March 5, 2010, Edwards and Marc Allen obtained a $3,054,778.13 loan from Bloomfield to Allen Investment Properties, LLC, based upon fraudulent and non-existent collateral, a portion of which was intended to satisfy the outstanding Shapiro loan. To obtain the loan from Bloomfield, Edwards and Marc Allen created bogus documents in pursuit of the Bloomfield loan titled "Evidence of Commercial Property Insurance" and "Certificate of Liability Insurance," which purported to be issued by MOC Insurance Company, when in fact, MOC Insurance Company had no business relationship with Edwards and Marc Allen and no relationship to the property. Edwards and Marc Allen also created a forged Letter of Credit for $5,000,000, which was supposedly issued by East West Bancorp on February 23, 2010. This Letter of Credit purportedly secured the Bloomfield loan (insurance for non-payment), when in fact they had no legitimate relationship with East West Bancorp. Bloomfield declared the loan in default and sought to present the Letter of Credit to East West for payment of the Loan. Edwards and Marc Allen also prepared and filed a fraudulent Notice of Voluntary Dismissal and Release of Lis Pendens in the Pinellas County Courthouse as to the Shapiro loan, bearing the forged signature of Lawrence Shapiro. These documents were supposedly prepared by attorney, A.A., who did not represent Edwards or Marc Allen, and who did prepare and file documents that bore the forged signature of Lawrence Shapiro.

12. To further mislead Bloomfield regarding the legitimacy of the fraudulent documents and the collateral for the loan, Edwards established four accounts at "phone.com," for the purpose of creating phony voicemail accounts purporting to belong to East West Bancorp and attorney A.A.

13. Edwards and Marc Allen also devised a scheme to divert the portion of the Bloomfield loan proceeds intended to satisfy the Shapiro mortgage into accounts they controlled. Shortly before the Bloomfield loan closing on March 4, 2010, Edwards and Marc Allen filed articles of incorporation for Lawrence Shapiro Lending, Inc., with the Florida Department of State Division of Corporations, listing Marc Allen as the registered agent. Edwards and Marc Allen then opened a bank account at Bank of America in the name of Lawrence Shapiro Lending, Inc., which was controlled by Marc Allen.

14. On March 5, 2010, Bloomfield wired $2,897,500 of the loan proceeds to First American Title Insurance Company in Santa Ana, California, to fund the loan to Allen Investment Properties, LLC, an entity controlled by Edwards and Marc Allen. Edwards and Marc Allen also provided the phony Lawrence Shapiro Lending, Inc., account information in the wiring instructions to the title company for the Bloomfield closing, successfully defrauding Bloomfield regarding the collateral for the loan and diverting the portion of the Bloomfield loan proceeds intended to pay off the Shapiro loan directly into an account controlled by Marc Allen. Neither loan was repaid.

15. Edwards was the primary person who orchestrated the closing process on the Bloomfield loan. Edwards was the one who met with Bloomfield representatives at Harbourtowne and who hosted the tour of the property on February 4, 2010. Edwards provided most of the due diligence information received by Bloomfield and was the one who introduced the Bloomfield representatives to other individuals, including Marc Allen, who portrayed himself as Edwards' father, and to an individual who portrayed himself as William Allen, Edwards's grandfather.

16. Other individuals assisted in perpetrating the fraud. Two pretended to be Lawrence Shapiro on the telephone, one pretended to be an employee of East West Bancorp on the telephone, who was later discovered to be Edwards' mother, and another was the notary who knew that the document giving Marc Allen power of attorney was fraudulent. Marc Allen received the vast majority of the proceeds from the fraud.

17. Records provided by William Allen reflect that Edwards created a fraudulent California Driver License in the victim's name, William L. Allen, with the victim's address at the time, 611 Winnetka, Woodland Hills, California, and the same month and day of birth as the victim, November 24. From at least January 3, 2009, to at least May 7, 2010, Edwards used this fraudulent driver's license to embezzle $508,019.15, from William Allen, which he used to pay his personal bills. As part of Edwards' embezzlement,

3

he used the fraudulent driver's license to open bank accounts, write fraudulent checks, and transfer funds electronically. Edwards admitted that he also used the driver's license to rent an apartment.

### Facts From Evidentiary Hearing

From the evidentiary hearing of July 22, 2014, the Court makes the following additional findings. The government was presented with substantial evidence of Edwards' fraudulent activity by the lawyers from the civil case. With this information, Assistant U. S. Attorney Thomas Palermo called Edwards' attorney, Bruce Young, and told him about the information he had against Edwards. Basically, Palermo told Young that the government had Edwards "dead to rights," and asked if Edwards wanted to plead guilty and cooperate. It was a take it or leave it deal. The government had such a strong case, it was not willing to negotiate.

Young discussed the matter with Edwards, told him about the evidence already in the possession of the government, and explained the options available to Edwards. Edwards chose to plead guilty and cooperate. Young explained to Edwards that, if he cooperated, he had to tell the government everything, be completely truthful, and be helpful. Edwards agreed and began debriefing with government agents. Edwards told Young that he was satisfied with meeting with the agents without Young present. It is common in the Middle District of Florida for cooperating defendants to meet with government agents without counsel present.

Edwards signed a written plea agreement admitting to the facts already known by the government. He admitted even more facts during his conversations with government agents. At the time of the execution of the guilty plea, the government did not know that

Edwards' mother had been used to play the part of an employee of the East West bank as a part of the fraudulent scheme.

At some point subsequent to Edwards' debriefing sessions with the agents, Attorney Young withdrew from the case, and Edwards hired Bjorn Brunvand as new counsel. Over several meetings, Brunvand reviewed with Edwards the evidence, the plea agreement, and Edwards' options. They discussed the possibility and advisability of withdrawing from the plea agreement. After representing Edwards for a period of time, a conflict arose and Brunvand withdrew as counsel. Edwards then hired Peter Sartes.

Mr. Sartes was careful to make sure his retainer was not paid with fraudulently obtained funds. He required it to be paid from family members, not Edwards. Edwards' mother came in to pay the fee. Mr. Sartes, in an abundance of caution, required Mrs. Edwards to sign an affidavit that the fee was in fact coming from her funds and was not connected to her son in any way. It turned out that that affidavit, like so many of the documents in this case, was false.

Not realizing he too had been scammed, Mr. Sartes began preparing for the sentencing hearing. He reviewed the plea agreement and the facts with Edwards. He obtained from Edwards possible mitigating factors for use at sentencing. Edwards claimed (1) he had mental health issues that made him susceptible to manipulation and that he had been manipulated by Marc Allen, and (2) Marc Allen was the driving force behind the fraudulent schemes.

As to the mental health issues, Edwards explained that he had been seen by Dr. Lazaro while incarcerated at the Citrus County Jail and that she would testify that he had a

mental condition that made him susceptible to manipulation by others. Mr. Sartes knew Dr. Lazaro fairly well because she had testified before in some of his cases. He called Dr. Lazaro's office and left word that he represented Edwards who said she could testify that Edwards had a mental condition making him susceptible to manipulation by others. Dr. Lazaro returned the call and left word with Sartes' paralegal that her testimony would be of no help to Edwards. Shortly thereafter, Edwards was Baker Acted (involuntarily held for psychiatric evaluation) when he self-reported himself to a psychiatric hospital as being a danger to either himself or others. Mr. Sartes doubted that hospitalization would be of use at sentencing because Edwards self-reported, particularly after the case "blew up." And very shortly before the scheduled sentencing, Mr. Sartes received a letter from "Jan Edwards" reportedly a psychiatrist from California, with information about Edwards' prior mental health issues. Mr. Sartes, now becoming very cautious about any evidence in the case, called the phone number shown on the letterhead, and no one answered the phone. He never received a call back nor was he ever able to locate a California psychiatrist named Jan Edwards.

    The case "blew up" when the government finally learned that Edwards had lied to them. A part of the fraudulent scheme involved someone playing the part of Michelle Lowe of the East West Bancorp in California. A bank letter of credit, purportedly from the East West bank, had been forged, showing Michelle Lowe as the executing officer and her phone number. When one called the phone number to verify the letter of credit, a phone.com voice mail box with a female voice identifying herself as "Michelle Lowe" would answer and ask for call back information. A "Michelle Lowe" would then call back

and verify whatever information was sought. The government had an audiotape with "Michelle Lowe's" voice. After listening to the audiotape, Edwards identified "Michelle Lowe" as Greta Monty knowing the government would consider her criminally involved in the conspiracy.

The government diligently pursued Greta Monty to charge her as a co-conspirator, but when they finally interviewed her, she obviously was not the voice on the phone. Greta Monty turned out to be from Albania and had a thick Eastern European accent. The voice on the phone had clear diction with no trace of an accent.

After further investigation, the government was able to identify the female voice as that of Edwards' mother. With that information in hand, the government invited Mr. Sartes and Edwards into the office for a conversation. The audio file of the female voice identifying herself as "Michelle" of East West bank was played in front of Edwards and Sartes. This time, Edwards was reluctant to identify the voice. Edwards was then told that the government believed the voice in the recording was that of his mother. Edwards acted surprised and asked to hear the recording again. After replaying the recording, Edwards agreed that the recording did sound something like his mother's voice. At the time, Edwards lived with his mother.

When asked why he previously identified the voice as that of Greta Monty, who had an Albanian accent, Edwards said that the listening conditions on the previous occasion were poor. The recording was played during the hearing for the Court's benefit and the voice was crystal clear. In a subsequent interview with the defendant's mother, she

7

admitted that she was, in fact, the voice on the recording. Of course, all of this caught Mr. Sartes completely by surprise.

Shortly before the sentencing hearing, the prosecutor made a courtesy call to Mr. Sartes advising him that the government was flying in witnesses from all over the country to rebut any possible sentencing mitigation factor Mr. Sartes might raise. The government had proof that several of the documents Edwards had given Mr. Sartes in an attempt to show that Marc Allen, not Edwards, was the true driving force behind the fraud turned out to be forgeries. The government had copies of checks written by Edwards on a bank account he claimed was only accessible by Marc Allen. As to the various notarizations on false documents that Edwards claimed had been obtained by Marc Allen, the government had proof that the signatures of the California notaries were falsified by use of a computer cut-and-paste. The government had the notaries from California flown in as witnesses. In fact, the government had Marc Allen prepared to testify at the sentencing.

Mr. Sartes was concerned that the use of most of the evidence provided him by Edwards for use in mitigation would do nothing more than open the proverbial can of worms. He discussed with Edwards the danger of having all of this brought out and rehashed in front of the sentencing judge. Edwards agreed that Mr. Sartes should only use very limited items in his mitigation argument.

On September 26, 2012, Edwards was sentenced to 210 months imprisonment. Edwards now claims that his guilty plea and his 210 month sentence were the product of poor representation by each of his three lawyers.

8

**Discussion**

**Ground One:** Robert Edward's (sic) guilty plea was not constitutionally knowing, intelligent, or voluntary. The guilty plea was induced by the threat of arguably suppressible evidence and threats of investigating Mr. Edwards's (sic) mother. In the absence of Mr. Edwards's (sic) misunderstanding of how the law applied to the facts, he would not have entered into this plea agreement.

Edwards breaks this claim into two subparts, Claim 1.1 and Claim 1.2. Claim 1.1 and Edwards' argument in support is, in its entirety, as follows:

> Mr. Edwards was unaware that the law enforcement officers were not allowed to question him without counsel present. Accordingly, Mr. Edwards did not realize that the inculpatory statements he made, at a meeting with the agents in the Palm Harbor restaurant, could possibly have been suppressed. If Mr. Edwards had known that, then he would have sought suppression prior to agreeing to any guilty plea. The effective denial of even the opportunity to suppress the improperly obtained evidence amounts to both constitutional error and violation of Mr. Edwards's (sic) substantial rights.

This claim fails. First, Edwards is mistaken. Law enforcement officers are entitled to question him without counsel as long as it is with his permission. Edwards consented to meeting with the agents without counsel present. His statements would not have been suppressed. Second, he did not make any statements until after he had agreed to plead guilty. The government left him little choice. They had him "dead to rights" without his statements. He voluntarily chose to plead guilty and then speak with the agents in an attempt to reduce his sentence.

His entire argument in Claim 1.2 is:

> The government threatened to prosecute Mrs. Edwards for conspiring to commit the fraud unless Mr. Edwards pleaded guilty. Mr. Edwards is aware that a government threat to prosecute a family member is not per se

9

> misconduct; but, like here, where the basis of such prosecution is flimsy, then the government's action equates to coercion under duress. Mrs. Edwards made a recording that Mark (sic) Allen used in perpetrating a fraud; however, she never agreed to assist in the fraud nor actually participated in any illegal activities (or legal activities in furtherance of illegal activities). She merely read a prepared script and allowed it to be recorded without further inquiry.
>
> If Mr. Edwards had known that their conduct was insufficient to justify a prosecution, then he would not have agreed to the plea agreement.

Again, Edwards is mistaken. At the time he signed his plea agreement, and even at the time of the entry of his guilty plea, the government did not know his mother had participated in the conspiracy. Edwards had lied and identified an innocent person as the one who had participated in the conspiracy by making the fake voice recording. And his statement that his mother never participated in the fraud is another in a long, long line of false statements. It is incredulous that one who makes a voice recording identifying herself as "Michelle Lowe" when that is not her real name obviously knows it is being used for an illegitimate purpose. That aside, in their testimony, all three attorneys were quite clear that the government never threatened Edwards about his mother in order to get him to plead guilty.

**Ground Two:** Mr. Edwards's (sic) attorneys failed to provide the constitutionally required minimum level of assistance during the plea bargaining stage. As a result of the deficient performance, Mr. Edwards received a more severe punishment.

Again, Edwards has broken this claim into two subparts, Claim 2.1 and Claim 2.2. The argument in Claim 2.1 in its entirety is:

> Attorney Bruce Young permitted Mr. Edwards to make an unfettered, inculpatory proffer. In the absence of that proffer, Mr. Edwards would either have not been prosecuted or would have received a substantially lower term of imprisonment. Mr. Edwards, in that proffer, provided account numbers, financial records, and explanations of those records that would not

>otherwise has (sic) been unavailable (sic) to the government. Counsel's failure to negotiate the appropriate immunity provision, counselor's failure to document Mr. Edwards's (sic) cooperative efforts and failure to negotiate how the government's (sic) could use the information was unreasonable.

Petition (Dkt. #1), pp. 14-15.

Edwards is mistaken. He did not make a proffer because the government never offered him the opportunity to make a proffer. His only opportunity from the government, other than go to trial, was to plead guilty with no proffer letter and cooperate. The government had him "dead to rights." His statements that he would not have been prosecuted but for his "proffer," or would have received a substantially lower term of imprisonment is conclusory, unsupported, and wrong. Edwards' loss of his potential benefit of cooperation was due to his own lies, not any failure on the part of his attorney.

Edwards' argument in support of Claim 2.2, in its entirety, is:

>Defense counsel has a duty to ensure the guilty plea is knowing, intelligent, and voluntary. Mr. Young never reviewed the elements of the crime with Mr. Edwards. Moreover, counsel did not review the plea agreement with Mr. Edwards. Mr. Young's secretary gave the plea agreement to Mr. Edwards, Mr. Young told Mr. Edwards to sign it and put it in the mail slot. He was never advised about the consequences of the plea, e.g., appeals waiver; admission of necessarily implicated factual basis, etc. By failing to ensure Mr. Edwards was aware of his suppression defenses, and failing to inform Mr. Edwards of the law governing the potential prosecution of his mother; counsel failed to meet the responsibilities required by both the Constitution and the controlling decisional authority.

Petition (Dkt. #1), p. 15.

This claim fails because, again, Edwards is mistaken. Attorney Young did review the elements of the crime with Edwards and also reviewed the plea agreement with him prior to Edwards executing the plea agreement. Young discussed with Edwards the

11

consequences of the plea and the options available. When they had these discussions, Attorney Young, like the government, had no idea that Edwards' mother had been a participant in the fraud. A lawyer cannot advise his client of consequences arising from events the client has hidden from him. As to Edwards' claim that his lawyers were ineffective for allowing him to waive his right to collaterally attack his sentence on the grounds of ineffective assistance of counsel, he cannot show prejudice because this Court is allowing him to make those claims. Since he has not shown deficient performance or prejudice, this claim fails.

**Ground Three:** Mr. Edwards's (sic) attorney's performance at sentencing was outside the norms of the criminal-defense bar. Counsel failed to introduce significant mitigating evidence and failed to object to the numerous factual inaccuracies in the presentence investigation report.

In support of ground three, Edward argues variously that many of the facts in the presentence report were inaccurate, Marc Allen was the driving force behind the fraud, his portion of the stolen funds was zero, not $507,000, and he had been subjected to abuse and fear by Marc Allen causing him to be easily manipulated.

These claims are unsupported by the evidence. Edwards himself at sentencing admitted the facts in the presentence report were true. Dr. Lazaro from the Citrus County Jail would not testify that Edwards was easily manipulated. Mr. Sartes obtained the bank records from the government concerning the $507,000 and examined them closely and determined that Edwards' claim that he received no part of the $507,000 was false. In sum, the Court finds that Mr. Sartes performed admirably at sentencing with the limited true facts available to him. This claim fails.

**Ground Four:** Counsel was ineffective for allowing Mr. Edwards to sign a plea agreement that included a plea waiver to collaterally challenge the sentence imposed or the right to appeal.

In support of ground four, Edwards argues that the appeal waiver contained in his plea agreement constitutes ineffective assistance of counsel. The appeal waiver portion of the plea agreement is a standard paragraph of written plea agreements in the Middle District of Florida. It is not ineffective assistance of counsel to allow a client to sign such an agreement. As to Edwards' claims about the waiver of his right to collaterally attack his sentence on the grounds of ineffective assistance of counsel, he is unable to show prejudice because this Court is allowing him to make those claims in this petition. His problem, of course, is that once he has made the claims, they fail for lack of support. He has shown neither deficient performance nor prejudice resulting from the act of any of his three lawyers. This ground is merely conclusory and fails.

**Ground Five:** The government breached its oral contract that induced the plea agreement by failing to pursue its promise to use Mr. Edwards's (sic) information in a manor (sic) that permitted a sentence reduction.

In support of ground five, Edwards contends that the government, not he, breached the plea agreement. He claims that he gave the government names of other parties who committed crimes. But there was no such testimony at the evidentiary hearing. In fact, Edwards declined to testify. The evidence that was introduced supports that Edwards, not the government, was the one that breached the agreement. He lied.

Because none of the five grounds raised by Edwards has merit, the petition fails.

It is therefore ORDERED AND ADJUDGED that:

13

      1.      Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Dkt. #1) is DENIED.

      2.      The Clerk is directed to enter judgment in favor of Respondent and against the Petitioner, terminate any pending motions, and close this file.

      3.      The Clerk is directed to terminate from pending status the related motion (CR Dkt. #63) in criminal case number 8:11-cr-476-T-30TBM.

## CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL IN FORMA PAUERIS DENIED

IT IS FURTHER ORDERED that Petitioner is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability. *Id*. "A certificate of appealability may issue … only if the applicant has made a substantial showing of the denial of a constitutional right." *Id*. at § 2253(c)(2). To make such a showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004)(quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003)(quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Petitioner has not made the requisite showing in these circumstances.

Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE** and **ORDERED** in Tampa, Florida, this 24th day of July, 2014.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

<u>Copies furnished to:</u>
Counsel/Parties of Record

F:\Docs\2013\13-cv-2586 evid hrg 2255.docx

15